## CLARK v. CROUT.

1. LUNATIC—AGREEMENT BY NEXT FRIEND.—A settlement of a pending suit between a lunatic by his next friend and the committee of the lunatic, whereby it was agreed in writing that the committee should be discharged from further liability on account of the lunatic's estate, but should provide for the proper maintenance of the lunatic during life, which agreement was put in the form of a consent decree, but was never presented to or signed by the judge, does not prevent the lunatic, or his administrator after his death, from demanding from the committee or his representatives an account of the lunatic's estate.

2. ESTOPPEL—PARTIES—AMENDMENT.—Whether such next friend is estopped from afterwards claiming as distributee of the lunatic anything from the committee, cannot be determined until the next friend has been made a party to this cause, which should be done in order to ascertain the true amount due by the committee.

3. ESTOPPEL—LUNATIC.—The performance by the committee of his part of this agreement cannot affect the lunatic or those properly claiming under him, as it now appears that the support came from the lunatic's own estate.

4. LUNATIC—LACHES.—The committee having properly maintained the lunatic, although he claimed to have lost the estate by an investment, and it not appearing that the sureties on the committee's bond were insolvent, the distributees who caused administration to be taken out on the lunatic's estate and action instituted against the committee for an accounting within a few months after the lunatic's death, are not chargeable with *laches*.

5. EVIDENCE—ANSWER IN FORMER CAUSE.—In an action by the administrators of a lunatic against the administrators of his committee, the answer of the committee to a bill in equity which had been brought by the lunatic during his life-time by next friend is not evidence in defendant's behalf.

6. PAYMENT BY TRUSTEE TO HIMSELF—CONFEDERATE SECURITIES—Where a committee received the estate of his lunatic in money in 1857, and there is no evidence of any investment of it prior to 1864, and the annual returns, regularly made, do not show any investment, it must be assumed that the committee retained the money in his own hands. Under these circumstances, his investment of the lunatic's estate in

Confederate bonds cannot be sustained, as he could not pay in a depre-
ciated currency, which was never legally made money, any more than
was required for the immediate exigencies of the trust estate.

7. RECOMMITTAL.—The case being remanded to a referee for other pur-
poses, permission is given to point out alleged errors in the account as
stated by the referee.

8. CONFEDERATE VALUES—SCALING.—In charging the committee's ac-
count during the war with the interest due by him, and then scaling
his disbursements in excess of the interest received, the referee commit-
ted no error, the disbursements having been made in Confederate cur-
rency.

9. A FINDING OF FACT based upon conflicting testimony, and concurred
in by referee and Circuit Judge, approved.

10. UNNOTICED PLEA.—There was error in not passing upon the plea of
*plene administravit praeter* interposed by the answer.

Before WITHERSPOON, J., Lexington, June, 1890.

The referee thus states the case :

By an order of this honorable court, his honor, Judge T. B.
Fraser, presiding, it was referred to the undersigned, as referee,
to take the testimony in this cause, and to "hear and determine
all the issues between the parties hereto as presented by the
pleadings herein."

In obedience thereto, I have held several references at Lees-
ville and Lexington Court House, have heard and carefully writ-
ten down the sworn testimony of the witnesses produced before
me by plaintiff and defendants, and I herewith file all such testi-
mony as a part of the report. And after a careful and patient
consideration of all such testimony, together with the pleadings,
and of the able arguments made before me by the counsel in the
cause, I have been enabled to reach a conclusion satisfactory to
myself upon all the issues of law and fact involved, and herewith
submit the same to the court as my report under the said order
of reference.

This is an action instituted in August, 1888, by B. F. Banks
and H. A. Clark, as administrators of the estate of Charles Banks,
deceased, against M. A. Crout and Alice E. Assmann, administra-
trixes of the estate of Uriah Crout, deceased, for an account of
the administration by defendants' testator, the duly appointed
committee, of the lunatic estate of plaintiffs' intestate, from the

1st day of February, 1856, until the death of Uriah Crout, alleging that such lunatic's estate consisted of two thousand nine hundred and twenty-six 64–100 dollars, received by said committee on or about January 1st, 1857; and that the labor performed by said lunatic for his committee, and his services rendered, were reasonably worth the further sum of two hundred dollars a year. The complaint also called in question the reasonableness of the charges made by the committee for the support and maintenance of the lunatic, and demanded an accounting.

The answer of the defendants admits the receipt of money as charged in the complaint, but deny that any services rendered by Charles Banks to Uriah Crout were of pecuniary value, or that the credits claimed by the committee for the support of the lunatic were unreasonable. The defendants also alleged as affirmative defences: (1) that a large part of the *corpus* of the lunatic's estate had perished in the form of Confederate bonds, into which Confederate money of the lunatic, properly in the hands of his committee, had been converted; (2) that the remaining part of such *corpus* had been necessarily expended for the lunatic's support during the war and immediately thereafter under the sanction of the Court of Equity; (3) that all matters here brought into controversy had been compromised and settled under an agreement entered into in 1870, between Charles Banks, by his next friend, and Uriah Crout, in a cause then pending between them in the Court of Equity; (4) that defendants had fully administered, with the exception of one asset, their testator's estate without any notice of plaintiff's claim. And defendants asserted as a counter-claim a demand for the lunatic's support from 1864 to the date of his death, and for burial expenses. Plaintiff's reply denied this counter-claim.

After the adjournment of the first reference and before the date of the second, B. F. Banks, one of the plaintiffs, died. This fact being brought to the attention of the referee, he noted it on the record, and thereafter the cause proceeded in the name of H. A. Clark, as sole surviving administrator of Charles Banks.

To the issues, briefly outlined above, the evidence was directed, and from that evidence I find the facts to be as follows:

Charles Banks, the son of Amos Banks, was a person of very

weak understanding, of unsound mind, or, in popular language, an idiot from his birth until his death. When Charles was about twenty-five years of age (in 1844), his father being dead, and he entitled to an estate of inheritance from his father and grandmother, his brother-in-law, Uriah Inabinet, filed a petition in the Court of Equity for Edgefield District, praying to be appointed committee of Charles's estate. By proceedings duly taken under this petition, Charles Banks was judicially declared to be an idiot, and his person and estate were committed to the custody and charge of Uriah Inabinet. In 1855, Inabinet died intestate and letters of administration on his estate were granted to Levi Shealy on November 16, of that year. Under petition of Uriah Crout to be appointed committee of the person and estate of Charles Banks in the place of Uriah Inabinet, deceased, Uriah Crout was so appointed by Chancellor F. H. Wardlaw on February 1st, 1856, such appointment to take effect upon his executing a bond in the penal sum of eight thousand dollars, conditioned for the faithful discharge of his trust. This bond was executed on April 22nd, 1856. By an order of Chancellor Wardlaw of June 27, 1856, passed upon the *ex parte* petition of Uriah Crout, committee, all papers relating to the appointment of Crout as committee were transferred to the County of Lexington, and all returns by this committee were ordered to be made to the commissioner in equity for Lexington County. In both of these proceedings, instituted by Uriah Crout, he was represented by Messrs. Carroll & Bacon, attorneys at law.

In 1856, Charles Banks was taken to the home of Uriah Crout in Lexington County. Charles was then about thirty-seven years of age, of large frame and good physique, but afflicted with a sore right leg, which incapacitated him for such work as is ordinarily done about a farm and around a farm house. And, moreover, his mental unsoundness was such that no work at his hands could be counted on or relied on, and therefore no services rendered by him were of any pecuniary value to Uriah Crout or to the family, or to anybody else. The evidence shows that he did little jobs of work about the stock yard and farm, but he did only what it pleased him to do and when it suited him. It was not required of him by Uriah Crout or the members of Mr.

Crout's family; it was not enforced by Mr. Crout or anybody else. Charles probably had a melon patch, in which at times he essayed to plow and hoe, and in which he gathered. He was sometimes in the fields where the hands were at work, and as it pleased him and for such length of time as it amused him, he would do the work assigned to the negroes for their day's task. When it suited him, he cut wood, carried it into the house, made fires, picked cotton, rode to the beef club and beef market for the family meat, fed and watered stock, drove cattle to pasture and back, went to mill, brought fish home from the neighboring ponds and creeks, and when it did not please him so to do, he did not do it. What he thus did had often to be done over again, and often not; but it was fitful, irregular, unreliable, "done more for the occupation of his mind than anything else," and of no value to any one. It was purely voluntary on his part, not enforced. What he did might sometimes have otherwise required other hands to do, but the other hands were there to do it, kept by their master, or hired by their employer for the purpose; and sometimes extra work was required to undo and do over what Charles had wrongly done. Comparing the testimony of the several witnesses, it is manifest that the life of this poor afflicted man was of no possible pecuniary value to Uriah Crout or to his family, and that he did as he pleased, and very frequently if asked to render assistance in any way, he complied only for a compensation—a nickle, a dime, or a piece of tobacco.

In this connection it is proper that this report should make some response to the mass of testimony bearing upon the treatment of Charles Banks in the house of his committee. Uriah Crout took Charles to his house at Holley's Creek in 1856, then with him to the Edmunds' place in 1857 or '58, and then to Leesville in 1879, and Charles remained an inmate of his committee's house, and a member of his committee's family, from 1856 until the death of Uriah Crout on January 1st, 1886. During all this time Uriah Crout and his first wife, Sophy, treated their unfortunate charge with all the consideration that could have been shown to one of their own children similarly afflicted, and they required their own children to do likewise.

Charles was ordinarily of good temper and good behavior, so

much so as to gain the affection of those with whom he was thrown, notwithstanding the many circumstances of frequent occurrence which tended to make him a repulsive object. But he was not always amiable. His temper, ordinarily placid, was unrestrained by a sound mind, and so became at times disagreeable and violent, even to the extent, on one or two occasions, of rendering him dangerous.' When thus yielding to his animal instincts, he was hard to control and offensive, a sore trial to those who were about him. He was at all times self-willed and wayward; to cross him was to irritate him. His clothing was such as it was proper for him to have. If occasionally clad insufficiently, it was the result of his own waywardness; if sometimes filthy, it was not the fault of the Crout family.

His lodgings were in no sense inferior to that of the committee's own children. No difference was made between him and them, and when put into a room specially built for him, it was a necessity caused by the mental and physical condition of the poor idiot. What the Crout family ate, he ate. He sat at the same table when he would, was fed from the same dishes, helped by the same hand. and had as much as any one else in that household, his plate being sometimes the first supplied, the difference, if any, between him and the children of Mr. Crout being in his favor.

His appetite not being regulated by any judgment on his part and not always under the observation or control of the older members of the family, his habits were sometimes disgustingly filthy. To remedy this evil, attention was given such as babies require at the hands of their nurses; and the testimony shows that often Mrs. Sophy Crout and others performed for him the most menial and disgusting offices. For the same reason his washing bill was large, and his supply of clothing greater than would have been otherwise necessary. Charles Banks was also afflicted physically. On his right leg was a running sore, sometimes worse and sometimes better, but never healed. This sore caused his leg and foot to swell, affected his gait and weakened his muscles. It had to be nursed and tended, washed and dressed, and all this was done. Its offensiveness to the smell was so great as to be

often apparent to mere visitors at the house and to passers by on the roadside.

The maintenance and support of Chas. Banks required food, lodging, fuel, washing, clothing, medicine, doctors' attention, and other incidentals. These were all paid for by Uriah Crout during his life-time and out of his estate after his death. It thus appears, and I so find, that Chas. Banks received at the hands of Uriah Crout and his two wives and his children the most considerate, kind, and humane treatment, far beyond the requirements of mere duty. To Mrs. Sophy Crout, particularly, was this poor imbecile indebted for many an act of attention and care which must have roused, even in his weak mind, if he was capable of entertaining any mental emotions, a feeling of profound gratitude.

On January 1st, 1857, Uriah Crout, as committee, received from Levi Shealy, administrator of the estate of Uriah Inabinet, former committee, the sum of two thousand nine hundred and twenty-six 64–100 dollars, belonging to Charles Banks. What was done with the money does not appear. There was some testimony on the part of the plaintiff, looking to a charge that Uriah Crout had used a large part of this money in purchasing a tract of land from Dr. Edmunds, but such was not the fact, as is conclusively shown by the testimony of Dr. Edmunds, from whom this tract of land was purchased. Mr. Crout paid Dr. Edmunds for this land in October, 1856, partly in paper of Dr. Edmunds bought up for the purpose, and the balance in cash, three months before any money of the lunatic's estate was received by Mr. Crout.

Uriah Crout was a man of large means and of the highest integrity of character. There is no testimony to show that Crout used this money for his own purposes. But whether he invested it, and if so, how he invested it, and if lent out, to whom it was lent, and when, and for what time, does not appear. All this was many years ago, and the evidence is perhaps not now to be had. At any rate, no evidence has been produced. We must necessarily be governed by his returns made under the requirements of the law, and it may be that he has suffered in failing to show what was done with this estate.

Regular returns were made by Uriah Crout down to the year

1868, inclusive. Of these returns, those for the years 1857 and 1858 have been lost through the casualties of war. Turning to the returns for 1859, filed January 12, 1860, we find that the committee charges himself with a principal sum of only $2,575.-95, which is $350.69 less than the sum received on January 1, 1857. How this amount out of the *corpus* was consumed, does not appear with certainty, but under the circumstances the right to charge commissions, the probability of a counsel fee having been paid to Messrs. Carroll & Bacon, the returns having been made to the proper office and since lost, and the commissioner in equity having approved the returns of 1859, I find as a fact that this amount of $350.69 was expended for such items as were properly chargeable to the *corpus* of the estate, and that on January 1, 1859, the true *corpus* was $2,575.95, together with interest $51.-72 up to that date.

The committee expended for his *cestui que trust* the following sums: $150.47 in 1859; $178.28 in 1860; $177.79 in 1861; $245.89 in 1862; $457 in 1863; $778.28 in 1864; $287.90 in 1865; $171.25 in 1866; $132.40 in 1867; all of which expenditures were reasonable and necessary to the proper support and maintenance of the idiot. But the expenditures of 1863 and 1864, and $130.50 of the expenditures of 1865, had relation to Confederate money, which amounts in excess of the interest received, when scaled according to Corbin's bill, were equivalent to $231.66 for 1863, $266.32 for 1864, and $162.62 for 1865. The credits claimed in the returns of 1863 and 1864 include $600 for board of the idiot at the house of his committee. For the years 1868 to 1887, both inclusive, we have no testimony as to what was actually expended, and the witnesses differ in their estimates. But from the preponderance of the evidence based upon estimates, $195 a year for the idiot's support during the years 1868 to 1887, both inclusive, was reasonable. This is slightly in excess of the annual income on the then reduced *corpus*, and is about $33 a year in excess of the average for the five years of 1859, 1860, 1861, 1866, and 1867, and nearly $17 in excess of the largest expenditures of any year in which Confederate prices did not prevail. There is no testimony to the point that living was higher after 1867 than before the war, or during

the years 1866 and 1867, or of additional expenditures then. Under these circumstances, the committee should not be allowed credit for more than the annual income, this credit to include all expenditures and charges.

I further find that Confederate money was the only currency in this State from January 1, 1862, to May 1, 1865; that it was freely taken and freely paid by all; that officers of the court received it with the sanction of the court; that it was regarded in the community as unpatriotic to refuse it; that prior to 1861 it was received by everybody, with very few exceptions; that Confederate money in hand in 1864 was enormously taxed if not funded; that Confederate bonds were generally regarded as government securities and a desirable investment.

Uriah Crout made provision in his will for the support of Charles Banks. Charles Banks died January 1, 1888, and his burial expenses amounted to $60.

On the *ex parte* petition of Uriah Crout, an order was passed by Chancellor Carroll on June 27, 1864, permitting said Crout to charge $300 a year for the board of Charles Banks during the years 1863 and 1864; this sum and necessary expenditures to be deducted from the *corpus* after exhausting the interest account.

On July 1, 1864, Charles Banks, by his next friend, George L. Banks (his brother), filed his bill in equity, calling Uriah Crout to account for his administration of the trust estate. Uriah Crout answered, claiming that by investment of $1,500 of the idiot's money in Confederate bonds (which were produced), and by his large expenditures during the years 1862 to 1865, inclusive, the entire estate of the idiot had been exhausted. After testimony taken in that suit, a compromise was agreed upon between the solicitors and signed by George L. Banks and Uriah Crout, to the effect that the action should be discontinued, Uriah Crout to be discharged from all accountability for the lunatic's estate, and to support him for the remainder of his life. An order or decree approving this arrangement was prepared and consented to, but never presented to the judge for signature, probably because the then judge of this Circuit had been of counsel in the cause. Some of the family of Charles Banks knew of this suit. George L. Banks is a distributee of Charles's estate.

Uriah Crout made an investment of $1,500 in Confederate bonds in 1864. It does not appear that Crout then had properly in hand $1,500 of the idiot's estate in Confederate money.

From the facts as thus found, the following are my

### CONCLUSIONS OF LAW:

1. That Uriah Crout is chargeable with twenty-five hundred and seventy-five 95–100 dollars principal, and fifty-one 72–100 dollars interest, on January 1, 1859, properly reduced to twenty-four hundred and seventy-four 44–100 dollars principal on January 1, 1865, with interest thereafter on said principal sum; but he is not chargeable with anything on account of the labor or services of his idiot charge.

2. That said committee is entitled to credit on his account for the several items mentioned in exhibit V, herewith filed as a part of this report.

3. The proceeding entitled "*Ex parte* Banks" is admissible in evidence in this case to the point that the committee was authorized to use a part of the principal of the trust estate, and the decree in that proceeding authorizes an encroachment on the *corpus* of Charles Banks's estate, so far as necessary.

4. That the cause entitled "Charles Banks, by next friend, George L. Banks, against Uriah Crout," does not operate as an estoppel by record, or *in pais*, upon the plaintiff in this action.

5. That the answer of Uriah Crout in said last mentioned cause, is not evidence in this case against the plaintiff here of any matters of fact alleged in said answer.

6. That the effect of the agreement between George L. Banks and Uriah Crout upon the rights of George L. Banks, cannot be determined in this action.

7. That the administrators of Charles Banks are not chargeable with *laches* in instituting this action, nor are the distributees of his estate chargeable with *laches* in failing at an earlier day to come into court as next friend of Charles Banks, and in his name demand an accounting from Uriah Crout of an estate in which they or their children would some day probably acquire an interest.

8. That there being no evidence that Confederate money be-

longing to the estate of. Charles Banks, beyond the annual collections of interest, was properly in the hands of Uriah Crout, either by having been collected for the necessity of the idiot or received from the outstanding securities which afterwards became worthless, and there being no evidence as to how the idiot's money was invested, it cannot be assumed that the securities called in were mere notes of hand, upon which the committee realized only par in Confederate money, and therefore the payment in 1863 in excess of the interest received should be scaled as of the value of Confederate money on July 1, 1863; the payment in 1864, in excess of the interest received, should be scaled as of the value of Confederate money on July 1, 1864; and the payments during the first four months of 1865, according to the average value of Confederate money during that period.

9. That for the same reason the investment of fifteen hundred dollars in Confederate States bonds in 1864 cannot be sustained.

10. That the plaintiff is entitled to judgment against the defendants as administratrixes of Uriah Crout for two thousand eight hundred and forty-six 75-100 dollars, together with interest on two thousand four hundred and seventy-four 44–100 dollars from May 1st, 1890, until judgment entered, and for costs as per statement herewith filed as exhibit Y to this report.

11. That the defendants are entitled to nothing on their counter-claim.

I will briefly state the reasons which have induced the above conclusions of law, or such of them as were seriously contested in the arguments made before me:

A lunatic or an idiot is incapable of conducting or directing a suit, and if he sues at all, it must be by his next friend, upon whom the court will rely for assistance in the action, and to whom resource may be had for the payment of the costs. But in such case the court itself will look to the interests of the idiot, and decree what is to his best advantage without regard to the next friend's consent. The right of a next friend to appear in court as the representative of a lunatic, gives the next friend no authority to make contracts for the lunatic, or enter into compromises affecting his estate. Only the Court of Equity could do that. If the proposed consent decree in Banks *v.* Crout had

been presented to the judges of the Circuit Court, it might have been signed or it might not. Not having been signed, it comes before us with no assent of the lunatic or of the court acting for him, and no individual was clothed with power to bind the lunatic. *A fortiori*, the answer of Uriah Crout in that action cannot be introduced as evidence against the personal representative of Charles Banks in this action, even as to points upon which the allegations of the answer were strictly responsive to the charges of the bill.

It seems to me that George L. Banks should be excluded from recovering directly or indirectly from Uriah Crout any portion of the estate of Charles Banks, and if George was a party to this action, I would have reported that defendants were entitled to receive credit for the share of George L. Banks in the net estate of Charles; but as he is not a party, his rights cannot be concluded now.

It was earnestly contended before me that this plaintiff and the distributees of Charles Banks's intestate estate are barred by *laches* from now presenting this demand. But in view of the fact that none of the distributees had any interest in Charles Banks's estate prior to January 1, 1888, and that this action was instituted within a few months thereafter, this defence cannot be sustained. The fact that any one of these distributees would have been permitted to act as next friend for Charles Banks, and in his name call upon Uriah Crout for an accounting and discovery of the trust estate, did not so impose such a proceeding upon them as a duty as to subject them to the charges of *laches* for not having done it.

In an accounting by a committee for his administration of his lunatic's estate, the burden is upon the committee to make a full disclosure. If his returns make such a disclosure, they will be evidence in his behalf, after the lapse of years and the losses of time. If he fails to make a full exhibit of his administration annually to the Court of Equity, the time may come when he will have to suffer for the want of evidence to prove the legal management of the trust. In this case, Mr. Crout was an upright, honest man, but when he took possession of this money of Charles Banks, the then latest utterance of the highest court in

South Carolina justified the belief that it was not improper for a trustee to use for his own purposes, and under the securities of his own bond, the money of his *cestui que trust*. *Sweet* v. *Sweet*, Speer Eq., 311. Mr. Crout's high character cannot, therefore, as matter of law, raise a presumption that he did not use Charley's money for his own purposes.

Or if it be conceded that this money was invested, there being not a tittle of testimony to show in what securities, the burden imposed by law upon the trustee cannot be relieved by mere inference that he invested it by lending it to his neighbors on well-secured notes. Why may it not have been invested in State bonds or stocks, railroad mortgage bonds, or other securities? *Pope* v. *Matthews*, 18 S. C., 458. In the absence of all testimony—all showing by the committee in his returns—as to the status of the *corpus* of the idiot's estate, it cannot be assumed that the securities converted into money in 1863 and 1864, were not securities which felt the appreciation of values then prevailing as to all articles of commerce or exchange.

To give the committee credit for the full amount in good money of all his payments during those years, would be to assume that he had previously invested the idiot's money, and that the securities in which he had so invested could be converted into currency only at their face value, an assumption not inconsistent with his returns or the testimony, but not supported by such evidence. It would be changing the burden of proof as fixed by the law. To the extent of the interest received, which must have been in Confederate money, I have given him full credit; only the balance has been scaled. As these payments cover the period of a year, without more specific date in most instances, I have taken the first day of July as the average date of them all.

As to the Confederate investment. This question has sorely perplexed the Southern courts since the war. Even in our own State the decisions are not in accord. In *Womack* v. *Austin* (1 S. C., 440), Moses, C. J., characterizes Confederate bonds as "the issues not of a recognized government, but of one endeavoring to assert and maintain its independence by waging war against the United States." This may be a correct *post bellum* view of the matter, but in 1864 they were regarded throughout the South

as the securities of an established government, which was sure to succeed in driving off a foreign invader then waging a war against her on her own soil. When the case of *Koon* v. *Munro* (11 S. C., 139) was brought before the court, a careful consideration was given to the question, and rules laid down which have since been adhered to. In the subsequent cases of *Wilson* v. *Braddy* (16 S. C., 520); *Hyatt* v. *McBurney* (18 *Id.*, 213); and *Brabham* v. *Crosland* (25 *Id.*, 535), the court have clearly and strongly declared the sound equitable principle, that the conduct of trustees in accepting Confederate money in payment of *ante bellum* securities must be determined in the light of that time, and not in the light of subsequent events. Some of these conditions have been strongly stated in those cases as they have been strongly stated in the testimony taken by me in this case; but there are some other facts, not stated in those cases nor in this testimony, but matters of history which, it seems to me, have been overlooked or not given their due weight. Those facts are:

(1.) That our courts have always regarded government securities as the most approved fund for the investment of trust funds, so that the conversion of personal notes, secured by solvent securities, or mortgages of land, into government securities, would not be considered a breach of trust.

(2.) That Confederate bonds were the securities of a government then recognized by the legislature and courts of this State, and regarded by our people as established, and whose independence, it was confidently believed, would surely be acknowledged at some future day by the United States and all other nations of the earth. The mere suggestion of a doubt upon this point aroused a wave of indignation against a distinguished member of the Confederate Congress from South Carolina late in 1864.

(3.) That no one knew or could possibly foretell, even as late as 1864, whether the war would last one year, five years, or ten years longer.

And yet it was in the light of these facts that trustees received Confederate money and invested in Confederate bonds. Nevertheless, the parties to this cause are entitled to my judgment upon the law as it is. And my judgment is, that under the law of this State, a trustee will be sustained in an investment of trust

money in Confederate bonds only where he rightfully had Confederate money in hand for investment; and that such money was rightfully in hand only where it was received in payment for a Confederate contract, in the collection of doubtful securities, or to meet the necessities of the trust estate, or for the payment of such claims against the estate as could be liquidated with that currency. Finding no evidence to bring the receipt of Confederate money by Uriah Crout for Charles Banks's estate under these exceptions, I have been forced to find as matter of law, that the interest receipts of Uriah Crout in 1863 and 1864 were the only Confederate money rightfully in his hands as trustee, and that therefore his investment in Confederate bonds must be disallowed. R. W. SHAND, Referee.

The case came before the Circuit Court on exceptions by the defendants. The Circuit decree, omitting its restatement, was as follows:

The cause came on to be heard upon the referee's report and defendants' exceptions to said report.

Before considering the defendants' exceptions, it is proper to refer briefly to the enviable reputation for integrity sustained by the committee up to his death, the nature of the unfortunate lunatic's afflictions, as well as to the exceptionally humane treatment of the lunatic by the deceased committee and the members of his family.

From 1856 up to the close of the war, Uriah Crout, the deceased committee, was regarded as one of the wealthiest citizens of Lexington District, and up to his death in 1886, he enjoyed a reputation for scrupulous honesty in all his business transactions. According to one of the witnesses, "his honesty was his religion." At the time that Uriah Crout was appointed the committee of Charles Banks (1856), he took the said Charles Banks to his home, and continued to maintain and care for this poor unfortunate lunatic as a member of his family up to the period of his (Crout's) death in 1886. Uriah Crout also provided in his will for the comfortable maintenance of Charles Banks after his (Crout's) death.

Charles Banks had been adjudged a lunatic, but in point of

fact was more of an idiot, when taken charge of by Uriah Crout. He was about 37 years of age, of a large frame, and was afflicted with a sore leg. Having no reason to control his appetite, Charles Banks was at times disgustingly filthy in his habits. His helpless and offensive condition frequently demanded the most menial attention. These disagreeable services were rendered by Uriah Crout and his family from 1856 up to the death of Uriah Crout in 1886. The referee finds that, during all of this period, and under such trying circumstances, this unfortunate creature was treated with the most humane consideration by Uriah Crout and the members of his family. The evidence shows that Uriah Crout exhibited a tender consideration for the comfort of his unfortunate *cestui que trust*, far beyond that usually manifested by a committee who is not related to his *cestui que trust*.

Some of the defendants' exceptions merely allege that the referee erred in ascertaining the balance reported to be due on the accounting, without indicating any specific error in said accounting. The specific errors alleged in the exceptions to the accounting are, (1) the failure of the referee to allow credit for the $1,-50() invested in 1864 by the committee in Confederate bonds; (2) the scaling of certain payments made by the committee in the years 1863 and 1864 and 1865; and (3) as to the amount of compensation allowed the committee by the referee for the maintenance of Charles Banks.

Did the referee err in not allowing the deceased committee credit for $1,500 invested in 1864 in Confederate bonds? It appears that Uriah Crout, as committee, made annual returns to the commissioner in equity for Lexington District. In his return for 1864, filed February 10, 1865, is the following entry: "Invested in 7 per cent. Confederate bonds, Nos. 17,515, 18,499—$1,-500." It also appears that two Confederate bonds, one for $1,-000 and the other for $500, were produced, and the commissioner in equity signed on each of said bonds the following endorsement: "Entered in return of Uriah Crout, committee of Charles Banks, in 1865." It appears that the two Confederate bonds, endorsed by the commissioner, as aforesaid, were produced in the former suit of Charles Banks, by next friend, v. Uriah Crout, committee, filed July 1, 1869, as aforesaid, and were found in

the record in the said suit. Under these facts and circumstances, and in consideration of the well established reputation of Uriah Crout for integrity and uprightness in his business transactions, I am satisfied that Uriah Crout held in good faith the two Confederate bonds as committee for Charles Banks. To hold otherwise, would cast a reflection upon the memory of Uriah Crout that could not be justified under the facts and. circumstances developed by the evidence in this case.

But as I understand the rule established in this State relating to investments by trustees in Confederate bonds, it must not only appear that the trustee acted in good faith, but it must also appear that the money alleged to have been so invested was at the time of said investment actually and "rightfully" in the hands of the trustee. *Koon* v. *Munro*, 11 S. C., 140; *Finch* v. *Finch*, 28 S. C., 165. The investment is set up in this case by way of affirmative defence, and the burden is upon the defendants to show the circumstances under which the trustee came into possession of the fund alleged to have been invested in 1864, to enable the court to determine whether the investment can be sustained under the established rule as above cited. The evidence fails to show that the deceased committee ever invested the *corpus* of Charles Banks's estate received January 1, 1857.

It does not appear that the deceased committee "rightfully" had any of the *corpus* in his hands in 1864. This defect in the evidence cannot be supplied by legal presumption in favor of the deceased trustee on account of lapse of time. It is probable that if Uriah Crout were alive, he could furnish evidence that defendants cannot produce. The rigid application of the above rule, with reference to Confederate investments, to this case may appear harsh. But the rule was established for the guidance of this court, and, as stated in *Finch* v. *Finch, supra*, must be regarded as the law until reversed. Under the authority above cited, the referee in the accounting did not err in refusing to allow defendants credit for the $1,500 Confederate bonds.

I do not think the referee erred in applying the Corbin bill to payments made by the committee in 1863 and 1864, and during the first four months of 1865. In addition to the reason given by the referee on this point, it appears that the *ex parte* petition

of the committee in 1863, for leave of court to encroach upon the *corpus* of the estate, is based upon the "high prices then prevailing." The $300 per annum that the court allowed for the board of Charles Banks for the period to which the Corbin bill was applied, as well as the prices paid for the articles furnished by the committee during that period, show that the prices charged had reference to Confederate money.

The charges by the committee in his returns for the support of Charles Banks up to the 1st of January, 1868, were regarded by the committee as sufficient, and were approved by the commissioner in equity. No charges were made for the support of Charles Banks subsequent to the 1st of January, 1868, and up to 1st of January, 1888, (when Charles Banks died) as he was then being maintained by Uriah Crout under the agreement for the settlement for the former suit instituted July 1, 1869. The evidence is conflicting as to what would be a proper compensation for the maintenance of Charles Banks from January 1, 1868, to January 1, 1888. The referee found from the preponderance of the evidence that $195 a year would be a reasonable compensation to be allowed for the maintenance of Charles Banks from 1868 to 1887, both inclusive.

It was argued that in view of the facts and circumstances connected with the case, the court should allow more liberally for the maintenance of the *non compos* than the charges made by the committee, or the amount allowed by the referee, even to the extent of encroaching upon the *corpus* of the estate of the *non compos*. It seems to me that the defendants are concluded by the committee's own estimate as to what was a reasonable compensation, and I do not think that the referee's finding upon conflicting evidence, as to the period between 1868 and 1887, inclusive, should be disturbed.

Defendants' other exceptions cannot, in my opinion, be sustained.

It is therefore ordered, adjudged, and decreed, that the defendants' exceptions to the referee's report in the above entitled case be overruled, and the report of the referee be confirmed and made the judgment of this court, except in so far as the said report provides for the payment of the costs of this action.

In equity the payment of costs is in the discretion of the court. The complaint in this action not only seeks an accounting for the estate received by the deceased committee, but also seeks an accounting for services alleged to have been rendered the deceased committee by Charles Banks for nearly thirty years at the rate of $200 per annum. The referee finds, and the evidence shows, that the deceased committee is not chargeable for any services rendered by Charles Banks. A considerable proportion of the testimony was introduced and much of the costs of this action have been incurred upon the issues raised by plaintiffs as to compensation for the services of the *non compos*, which issue has been decided in defendants' favor. Under these circumstances, it would not be just to charge the defendants with the payment of all the costs of this action. It is ordered and adjudged, that plaintiff do pay one half of the costs of this action, to be taxed by the clerk, and the defendants pay the other half of said costs; and to this extent the referee's report is hereby modified. In all other respects the referee's report is confirmed.

Defendants appealed.

*Messrs. Meetze & Muller* and *Melton & Melton,* for appellants.

*Messrs. Sheppard Bros.,* contra.

September 14, 1891.  The opinion of the court was delivered by

MR. JUSTICE McIVER. This was an action brought by the plaintiff, as administrator of Charles Banks, a deceased lunatic, against the defendants, as administratrixes of Uriah Crout, the duly appointed committee of said lunatic, for an account of the administration of the estate of the lunatic, as well as for his services. The facts of the case are so fully and clearly stated in the report of the referee, which, together with the decree of the Circuit Judge, should be incorporated in the report of the case, as to render it unnecessary to make any further statement. We will therefore proceed at once to the consideration of the several questions presented by this appeal, stating only such facts as are necessary to a proper understanding of such questions.

It is conceded that Uriah Crout, after having qualified as committee on or about the 1st of January, 1857, received from the estate of the former committee the sum of $2,926.64 for the lunatic, and this appeal concerns only the administration of that fund. The defendants by their answer set up several defences: 1st. That a large portion of the fund was properly invested in Confederate bonds in 1864, which, of course, became worthless at the close of the war between the States, and that the balance of it was exhausted in the proper maintenance and support of the lunatic. 2nd. That all the matters here brought into controversy had been compromised and settled by an agreement entered into in 1870 between Charles Banks, by his next friend, George L. Banks, and Uriah Crout, in an action then pending in the Court of Equity between them. 3rd. That the defendants had fully administered the estate of Uriah Crout, before notice of the claim set up herein, except one bond held by them due to said estate for about the sum of one thousand dollars. The defendants also set up, as a counter-claim, a demand for the maintenance and support of the lunatic after his funds were exhausted up to the time of his death, and for burial expenses.

The referee disallowed the investment in Confederate bonds, overruled the defence resting on the compromise of the former suit, and, after stating the account as set forth in exhibit Y to his report, recommended that the plaintiff have judgment against the defendants, as administrators of Uriah Crout, for the balance therein shown and for the costs of this case; but it does not appear that any notice was taken of defendants' plea of *plene administravit praeter*. To this report defendants filed numerous exceptions, and the case was heard by his honor, Judge Witherspoon, who rendered judgment overruling all of the exceptions and confirming the report except as to costs, which he adjudged should be paid, one half by the plaintiff and the other half by the defendants.

From this judgment defendants appeal upon the several grounds set out in the record, which, as stated in appellants' argument, present the following matters for the consideration of this court: "1st. The effect of the former suit, and the agreement therein, upon this action and upon the heirs of Charles Banks, especially

George L. Banks, the next friend, and his heirs.   2nd.  The *laches* of Charles Banks and of other parties now interested in this action.   3rd.  The validity of the investment in Confederate bonds; and herein the competency, as evidence in this action, of the answer of the committee in the former suit touching this subject.   4th.  The statement of the account; and herein of exhibit Y to referee's report, the scaling of the expenditure during the war, and the value of the maintenance of the *non compos* since the war.   5th.  The counter claim.   6th.  The plea of *plene administravit praeter*."

First, then, as to whether the former suit and the compromise thereof can operate as a bar to this action.  It seems that on the 1st of July, 1869, Charles Banks, by his next friend, George L. Banks, who was his brother, filed a bill in the Court of Equity against Uriah Crout as committee, calling on him to account for his administration of the funds belonging to the estate of the lunatic.  After the pleadings in that case (copies of which are embraced in the "Case" as prepared for argument here) were made up, and after some testimony had been taken therein, an agreement was made for the compromise of that suit, whereby the same was to be discontinued, and Uriah Crout on his part agreed to supply the lunatic, for and during his natural life, with good and comfortable clothing and wholesome food, and such necessary care and attention as his situation required, whereupon the said Uriah was to be discharged from any further liability on account of the funds received by him on account of the lunatic.  The terms of this agreement were reduced to writing and signed by Geo. L. Banks and Uriah Crout in July and August, 1870, and an order was prepared, to be submitted to the court, confirming such agreement, to which was appended the written consent of the complainant's solicitor; but the order was never signed, never having been presented to the court, probably because the judge of the Circuit had been of counsel in the cause.

The lunatic himself being incapable of contracting, neither he nor his distributees can be affected by such agreement, unless it could be shown that his next friend had authority to contract for him.  We are not aware of any authority which recognizes the power of one who has assumed the office of next friend of a luna-

tic to enter into any contract or agreement binding upon the lunatic. He may institute suit for the benefit of the lunatic, but the court before which suit is pending is charged with the protection of the interests of the lunatic, and it alone could authorize any compromise of his legal rights; and this the court would never sanction unless, after full inquiry, it was satisfied that such a course was best for the interests of the lunatic. This view was manifestly recognized by the parties to the former suit, as well as their counsel, for they prepared and agreed upon an order sanctioning the compromise; but, unfortunately for the defendants in this action, such order never was signed. Whether it would or would not have been signed by the court, we cannot now know with any degree of certainty, as all the testimony in that case is not before us. But from what is before us, we think the action of the court would have depended largely, if not entirely, upon the view which it might take of the Confederate transactions of the committee; especially of the propriety of the investment of a large portion of the lunatic's estate in Confederate bonds.

Our remark made above that neither the lunatic *nor his distributees* can be affected by such agreement, is not to be understood as prejudging the question whether George L. Banks, or rather his representatives (he having died since the commencement of this action), is estopped *by his being a party to said agreement* from sharing in any recovery that may be had against the defendants, or even as indicating any opinion whatever as to that question. Until his representatives are made parties, that question cannot properly be considered. And as we think that question should be determined in this action, provision should be made to bring them in as parties. For if it should eventually be determined that George L. Banks, by signing that agreement, is estopped from making any claim against the estate of the committee, then clearly whatever would otherwise be his share of the recovery, should first be deducted from any amount that may be established in this action, before any judgment is rendered against the defendants herein. It is stated in the "Case" that this point was made in the court below; but, so far as we can discover, it was not distinctly passed upon, and the

failure to do so is made one of the grounds of exception to the
Circuit decree. It seems to us, therefore, that the decree should
be modified in this respect, and that the pleadings should be so
amended as to bring before the court the parties necessary to a
proper determination of this question.

It is contended, however, that Uriah Crout having performed
his part of the agreement by providing for the comfortable sup-
port of the lunatic during his life, his estate has a right
to claim, in equity and good conscience, that the entire
agreement shall now be carried out by a discharge of the
estate of the committee from any further liability. But it will
be observed that until it is made to appear that such support was
provided for out of the committee's own funds, which involves
the question whether the lunatic's estate had been exhausted,
Uriah Crout was doing no more than what his duty as committee
required of him. And, as we shall presently see, the lunatic's
estate not having been exhausted, this ground cannot, for this
reason, be sustained.

As to the defence of *laches*, we agree with the referee and the
Circuit Judge. To say nothing of the fact that this defence is
not set up in the answer, we see nothing in the case to
sustain it. Charles Banks died in January, 1888, and
this action was commenced within a few months there-
after, and certainly there was no unreasonable delay in institut-
ing this action. It is true that the parties who might ultimately
be entitled to an interest in the lunatic's estate might possibly
have instituted an action against Uriah Crout to save the estate
of the lunatic from waste or destruction, or to enforce its applica-
tion to the support of the lunatic, as required by the terms of
the trust which Crout had assumed ; but this could only have
been done under proper allegations and proofs. So far as we can
see, there were no grounds upon which such allegations could
have been made. The testimony shows that Crout continued to
discharge his duties faithfully up to the time of his own death,
and made provision in his will for the support of the lunatic as
long as he might live, which seems to have been faithfully car-
ried out. There is no testimony that the security given by him
had become impaired by the sureties on his bond becoming insol-

vent, and his own estate seems to have been sufficient to enable him to meet any balance that might remain of the trust fund, after the trust terminated by the death of the lunatic. There was nothing to call for the bringing of such an action as is suggested, except the fact that Crout claimed by his returns to have invested $1,500 of the trust fund in Confederate bonds in 1864, and this we do not regard as sufficient to require that an action should have been brought within a reasonable time thereafter by parties who might, or might not, be ultimately interested in whatever balance of the lunatic's estate might remain after his death, at the peril of being charged with *laches* when they brought their action after their rights had become vested. But in addition to this, the referee finds as matter of fact that Crout continued to make regular returns down to and including the year 1868, copies of which are set out in the "Case," from which it appears that he claimed a balance due him in the return for 1865. Nor can the fact that an agreement of compromise, hereinbefore referred to, had been entered into between George L. Banks and Uriah Crout in 1870 avail; for this, if known to the parties ultimately interested, would be accompanied with the knowledge that such agreement had never been sanctioned by the court, and was therefore not binding.

Next, as to the validity of the investment in Confederate bonds; and as preliminary or incidental thereto, the question as to the competency of the answer of Crout in the former case, as evidence in this case. While we agree with the view taken of this question by the referee and the Circuit Judge, yet we regard it as scarcely a practical question in this case; for it seems to us that all the evidence furnished by the answer, so far as this investment is concerned, is contained in the returns of Crout, which were received without objection.

Recurring, then, to the main question, we do not think this investment can be approved. Crout received the money of his ward on or about the 1st of January, 1857, and, in the absence of any testimony whatever tending to show that he ever invested it in any way prior to 1864, we are bound to conclude that he retained it in his own hands. This, though a technical breach of trust, as it is termed by Wardlaw,

Ch., in his Circuit decree in *Spear* v. *Spear* (9 Rich. Eq., at page 188), did not necessarily involve any moral delinquency whatever. Indeed, under the then latest utterance of the highest judicial tribunal in this State, in the case of *Sweet* v. *Sweet* (Speer Eq., 309), such a course was not only approved, but rather recommended. It is true that the reasoning of that case was disapproved in the subsequent case of *Spear* v. *Spear*, *supra*, which, however, was not heard until January, 1857 ; but when decided does not appear, as it was not customary at that time to give the dates of the filing of opinions. It does appear, however, that the volume containing the last mentioned case was not published until 1858. It is very obvious, therefore, that Crout could not possibly have been influenced by what was said in the last case, in the disposition of the money when he received it. At all events, the undisputed facts remain that he received the money in January, 1857, and he never claimed to have invested it in any way until 1864. Even in his answer to the former case, he makes no such claim. In the face of the fact that there is no evidence whatever that Crout had ever made any other investment, and in view of the further fact that although he made regular returns, he never even claimed that he had made any investment of his ward's funds until 1864, and that he entered the investment now in question upon his next return, we do not see how it is possible to doubt that the trust fund had been retained in his own hands up to that time. This being so, when Crout received the trust fund in January, 1857, he became a debtor to the estate of the lunatic, and continued to be so until such debt was properly discharged.

The practical question, therefore, is whether a trustee becoming indebted to the trust estate, in gold or its equivalent in 1857, could properly discharge such indebtedness by paying the amount thereof to himself in 1864, in a depreciated currency. To the question thus stated, there can be but one answer. Confederate treasury notes, though used as money, never really acquired a legal character as such. Such a debt, therefore, could not legally be discharged with Confederate treasury notes, except by the creditor consenting to receive them as money, when, upon the principle that anything received by the creditor as payment shall

operate as such, the debt might be thus discharged. But this principle cannot be applied to the present case, for the committee occupied the position of both debtor and creditor, and as the principle really rests upon the agreement to receive such depreciated currency as payment, it could not apply in a case where no such agreement was possible, for the reason that the two parties necessary to make an agreement were wanting ; the committee could not, as debtor, make such agreement with himself as creditor.

While, therefore, we can very readily understand how a trustee might be justified, under proper circumstances, in receiving *from another* Confederate treasury notes in payment of a debt due to the trust estate, even when contracted on a gold basis, we do not see how he could be justified in receiving *from himself* payment of such a debt in that kind of currency, further than what was necessary for the immediate exigencies of the trust estate. While, therefore, the committee may be justified in receiving even from himself so much as was necessary for the comfortable support of the lunatic in Confederate currency, from the necessity of the case, inasmuch as the evidence shows, and the referee so finds, that such currency was the only one in use in this State from 1st January, 1862, to 1st of May, 1865 ; yet there was no such necessity to justify the receipt of anything more. We agree, therefore, with the referee and Circuit Judge that the alleged investment in Confederate bonds cannot be sustained.

The fourth matter presented by the counsel in behalf of appellants for the consideration of this court, involves three inquiries : 1st. As to the correctness of the figures in the account as stated by the referee, and the alleged omission to allow commissions on the expenditures for 1863, and on the interest which accrued to date of report. 2nd. As to scaling the expenditures during the war. 3rd. As to the value of the maintenance of the lunatic since the war. As to the first, we find it difficult to ascertain with certainty whether there is any error in the figures or in the omission of credit for commissions, owing to the condensed form in which the account is stated ; and as the case will be recommitted to the referee for another purpose, the parties will be allowed to show, if they can, any errors in the figures or any omissions of credit for commissions. As to the

2nd inquiry, it seems that the referee only scaled the excess of the disbursements in 1863, 1864, and the first four months of the year 1865, over and above the interest for those periods; and in this we do not see that there was any error. These disbursements were made in Confederate currency, and the prices paid for articles furnished the lunatic. as shown by the returns of the committee, are quite sufficient to justify the course which the referee pursued. The 3rd inquiry presents only a question of fact upon which there was conflicting testimony, and, under the well settled rule, the conclusion adopted by the referee, and concurred in by the Circuit Judge, cannot be disturbed.

As to the counter claim. It follows necessarily from what has been said, that there was no error in disallowing it, except so far as the burial expenses are concerned, and they are more properly allowed by the referee as a credit on the account as stated by him.

The only remaining inquiry is as to the plea of *plene administravit praeter*. So far as we can discover, this matter has not been distinctly passed upon either by the referee or the Circuit Judge. In this we think there was error; for if the defendants can sustain this plea, any judgment which may be rendered against them should be subject to such plea. It seems to us, therefore, that the case should be recommitted to the referee, for the purpose of having the issues raised by that plea passed upon.

The judgment of this court is, that the judgment of the Circuit Court, except as modified herein, be affirmed, and that the case be remanded to that court for the purpose of such further proceedings as may be necessary to carry out the views herein announced.